THE BALLANTYNE COMPANY, A CORPORATION, APPELLEE, V.
CITY OF OMAHA, A MUNICIPAL CORPORATION, APPELLANT.

113 N. W. 2d 486

Filed February 2, 1962. No. 34971.

*Herbert M. Fitle, Bernard E. Vinardi, Irving B. Ep-*

stein, Frederick A. Brown, Benjamin M. Wall, Edward M. Stein, and Steven J. Lustgarten, for appellant.

Seymour L. Smith, for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The plaintiff and claimant, The Ballantyne Company, a corporation, appealed to the district court for Douglas County from the award of the appraisers duly appointed by the city council of the City of Omaha in a condemnation action allowing said plaintiff no damages.

The Ballantyne Company, plaintiff, is a corporation existing under the laws of the State of Nebraska. The City of Omaha, defendant, is a city of the metropolitan class by virtue of the laws of the State of Nebraska. We will refer to The Ballantyne Company, a corporation, as the plaintiff or the company, to the City of Omaha as the defendant or, on some occasions, as the city, and to the other parties involved in this cause by their names.

The condemnation proceedings instituted by the city were for the purpose of obtaining certain private property upon which to construct a municipal auditorium.

It was stipulated by the parties that this cause be tried to the court without a jury.

The trial court found generally for the plaintiff and against the defendant, and that the plaintiff was entitled to recover from the defendant the sum of $45,871.26. Judgment was rendered in accordance with the findings, in the amount of $45,871.26, with lawful interest from the date of the judgment, and the costs of the action.

The defendant filed a motion for new trial which was overruled. The defendant perfected appeal to this court.

The plaintiff's amended petition alleged in substance that the plaintiff was the lessee of a tract of land being acquired by the defendant; that the plaintiff sustained

damages by reason of the taking of the leasehold and as a consequence suffered expenses of removal, moving, and relocating trade fixtures; and that the plaintiff required a special type of building for its business and suffered expense of making a new building suitable for its purpose, and claimed damages in the amount of $69,257.96, plus interest at 6 percent per annum from and after July 10, 1951.

The answer of the city admitted that the city had instituted condemnation proceedings. The answer alleged that the plaintiff was not entitled to damages; that the finding on the part of appraisers allowing no damages to the plaintiff was legal and just; and that the plaintiff failed to perfect its appeal to the district court by reason of the filing of a faulty bond with the city clerk of the city of Omaha.

The defendant assigns as error that the trial court was without jurisdiction; that the judgment is contrary to law and to the evidence; and that there was error of law occurring at the trial.

The defendant contends that the appeal bond in this case was jurisdictional.

The appeal bond filed with the city clerk of the city of Omaha was an undertaking in the specific amount of $200. The above bond was filed with the city clerk, and the surety approved by the city clerk July 12, 1951. On December 19, 1956, the plaintiff filed a motion asking leave to file an additional appeal bond, which was allowed. The additional appeal bond provided to pay all costs adjudged against the plaintiff.

Section 14-813, R. R. S. 1943, provides in part: "Whenever the right of appeal is conferred by this act, the procedure, unless otherwise provided shall be substantially as follows: The claimant or appellant shall, within twenty days from the date of the order complained of, execute a bond to such city with sufficient surety to be approved by the clerk, conditioned for the faithful prosecution of such appeal, and the payment of all

costs adjudged against the appellant. Such bond shall be filed in the office of the city clerk. It shall be the duty of the city clerk, on payment or tender to him of the costs of the transcript, * * * to prepare a complete transcript of the proceedings of the city relating to their decision thereon. It shall be the duty of the claimant or appellant to file a petition in the district court as in the commencement of an action within thirty days from the date of the order or award appealed from, and he shall also file such transcript before answer day. The proceedings of the district court shall thereafter be the same as on appeal from the county board. Any taxpayer may appeal from the allowance of any claim against the city by giving a bond and complying with the foregoing provisions; * * *."

In the case of Creighton University v. City of Omaha, 91 Neb. 486, 136 N. W. 829, it was said: "The inquiry arises as to what step it is that is to be taken by an appellant in order to confer jurisdiction upon the district court? We take it as not to be questioned that the jurisdiction is obtained by the filing of some pleading or process therein. As appears therein, the section under consideration provides: 'It shall be the duty of the claimant or appellant to file a petition in the district court as in the commencement of an action within thirty days from date of the order or award appealed from,' and he shall file the transcript before answer day. Thereafter the proceedings shall be the same as appeals from the county board. This provides a departure from the law of ordinary appeals. It is not the filing of the transcript that gives jurisdiction, for it may be filed at any time before answer day. The petition is the first filing to be made and that must be filed within the 30 days named. Until that is done the case is not in court nor within its jurisdiction. This seems to be the plain provision of the section. It is within the power of the legislature to make the change from the usual course of procedure. The provision is a special one, probably

enacted for the purpose of expediting the settlement of questions which may arise in the matter of grading and paving streets. We can see no way of escape from its direction."

Section 25-852, R. R. S. 1943, provides in part: "The court may, either before or after judgment, in further-ance of justice, and on such terms as may be proper, amend any pleading, process or proceeding, * * * when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved. Whenever any proceeding taken by a party fails to conform, in any respect, to the provisions of this code, the court may permit the same to be made conformable thereto by amendment."

The term "proceeding" as used in the statute includes filing of appeal bond, and the right to amend such bond is within the purview of the statute. See In re Estate of Kothe, 131 Neb. 780, 270 N. W. 117. In the cited case it was said: "This court has frequently held that where a bond is given, even if defective, still the court has ob-tained jurisdiction, and that the proper procedure is for the adverse party to move to compel the appellant to give a proper bond in an amount and condition as re-quired by law; * * *."

Section 25-853, R. R. S. 1943, provides: "The court in every stage of an action must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

The right to amend an appeal bond is within the pur-view of the statute. See In re Estate of Hoagland, 128 Neb. 219, 258 N. W. 538. In the cited case the court said: "In this O'Dea case the following rule was an-nounced by this court: 'Steps taken by filing an appeal bond to obtain a review of an award made by appraisers, of damages on account of the laying out of a public high-way, is a proceeding in an action, and clearly within the

statutory meaning of that term; and if such bond be found to be defective it may be amended in the appellate court, by consent of sureties, or a new bond may be filed.' The action of the trial court in permitting and approving the amendments to the appeal bond is approved as being not only within the spirit, but as required by the express wording, of the statute quoted." See, also, State ex rel. Miller v. Cavett, 163 Neb. 584, 80 N. W. 2d 692; Rube v. Cedar County, 35 Neb. 896, 53 N. W. 1009. The defendant's contention is without merit.

The plaintiff contends that the defendant's assignments of error are insufficient, and that assignments of error in the language of the statute relating to grounds for a new trial in the district court, without more, are insufficient as assignments of error in the Supreme Court.

In Hartman v. Hartmann, 150 Neb. 565, 35 N. W. 2d 482, this court said: "Under section 25-1919, R. S. 1943 (now section 25-1919, R. R. S. 1943), and Revised Rules of the Supreme Court, Rule 8 a2(4), consideration of the cause on appeal is limited to errors assigned and discussed, except that the court may, at its option, note a plain error not assigned." See, also, Okuda v. Hampton, 154 Neb. 886, 50 N. W. 2d 108.

In examining the defendant's brief it is apparent that it has discussed in detail every assignment of error which it assigned. We conclude that the defendant's brief is sufficient in this respect to justify this court in proceeding to an adjudication of this appeal. The plaintiff's contention is without merit.

On July 29, 1947, necessity ordinance No. 15706 declaring the necessity of appropriating certain private property for the purpose of owning and constructing a municipal auditorium was passed by the city council. The mayor of the city appointed three disinterested freeholders to appraise and assess damages sustained by the various owners of the property to be taken by the city under the provisions of ordinance No. 15706 and to report to the city council what the freeholders recom-

mended be awarded. The committee of freeholders made a report. The committee viewed and inspected all of the real estate involved and made awards to the owners and persons interested therein in the following amounts: For Lots 2 and 3, and the north 115 feet of .Lot 4, Block 78, and the south 14 feet of vacated Davenport Street adjoining the north 115 feet of Lot 4 on the north, to Carl W. Jensen, county treasurer, for taxes $710.84; Occidental Building and Loan Association, mortgagee, $24,357.19; Robert S. Ballantyne, fee owner, $196,361.97; and The Ballantyne Company, a corporation, tenant, no award.

On May 25, 1949, articles of incorporation of The Ballantyne Company were filed in the office of the Secretary of State. The name of the corporation was The Ballantyne Company, located in Omaha. Its resident agent was J. Robert Hoff, and his address was 1707-11 Davenport Street, Omaha, Nebraska. The names of the incorporators were Robert S. Ballantyne and Ethel C. Ballantyne.

Robert S. Ballantyne and J. Robert Hoff, as relators, filed an application for writ of mandamus in the district court for Douglas County on September 8, 1947, against the mayor and members of the city council of the city of Omaha, respondents. It was stipulated that in the mandamus case the Supreme Court returned its mandate to the clerk of the district court on July 21, 1948, the opinion being released on June 29, 1948. State ex rel. Ballantyne v. Leeman, 149 Neb. 847, 32 N. W. 2d 918. This court held that the referendum section of the Omaha home rule charter applies to legislative acts of the city council, but not to administrative or executive matters; and that to allow a referendum to be invoked to annul or delay executive conduct would destroy the efficiency necessary to successful administration of the business affairs of a municipality. The relators did not prevail in this action.

On June 1, 1949, Robert S. Ballantyne entered into an

agreement with The Ballantyne Company, a corporation, wherein Robert S. Ballantyne assigned to the corporation all the assets he owned, including accounts receivable, merchandise on hand and in transit, furniture, and automobiles. At a meeting held by the board of directors of The Ballantyne Company, a corporation, Robert S. Ballantyne became president and treasurer of the corporation, Ethel C. Ballantyne vice president, and J. Robert Hoff secretary.

The business of the plaintiff is a specialized business. It includes the manufacturing, assembling, and sale of sound and projection equipment which is completely manufactured from sheet metal to the finished product. The company manufactured only theatre equipment. The coming of the drive-in theatre in 1950 to 1952 made a great change, and increased the demand for the plaintiff's products.

Robert S. Ballantyne first conducted the business as an individual. During World War II, Hoff married Ballantyne's daughter. After his service in the Navy, in August 1945, he joined his father-in-law, Robert S. Ballantyne, in business, the latter having no son to carry on the business. Hoff was advised by Robert S. Ballantyne that they would form a partnership or a corporation.

The amounts of the award for the fee title were paid, and deed given by the owner of the fee title to the city on August 3, 1951. The Auditorium Commission of the City of Omaha leased the premises to the plaintiff for 1 year commencing August 1, 1951, at a rental of $700 a month. This lease was subject to cancellation upon 30 days notice. On May 27, 1952, notice was served on the plaintiff to vacate the premises.

Hoff testified that the plaintiff vacated the premises approximately June 1, 1952, but started to move in the last week of May 1952. Hoff further testified that the plaintiff's sales territory extended throughout the world.

The plaintiff for some years had been in the process of developing a test panel, which is an instrument neces-

sary in the manufacture of equipment which produces sound. Such equipment must be tested for its aptitude for a particular building and to the location in the building. When Hoff joined the business, the test panel had been in the process of development 3 or 4 years and was about 40 percent completed. By 1950, the test panel had reached a point of perfection. It is an instrument having over 1,000 individual wires running to and from it. This test panel was disturbed by the condemnation. A claim was made for the value of this test panel to the city's official appraisal board in the amount of $10,840. A communications engineer who examined the test panel gave an opinion that to assemble it at a new location would cost between $11,000 and $11,500.

The building the plaintiff was operating in at the time of the condemnation proceedings was equipped for the business. The foundation was especially fitted and arranged for the heavy machines used in the business.

The plaintiff moved 7 blocks from its original location to a building on Jackson Street which was purchased by Robert S. Ballantyne and leased to the plaintiff. Robert S. Ballantyne superintended the work of reassembling the plant and overseeing the work. The Jackson Street location was a smaller building and had to be arranged differently than the building which the company left. This building had three floors as against two floors in the building from which the plaintiff had to move. The Jackson Street location was not suited for the company's business. It was necessary to add toilets on the second floor. The plaintiff was required to meet certain standards provided for by law in its new location. The heating plant was built into the Davenport Street location so it could not be moved. The heating plant in the Jackson Street property needed attention. The air-conditioning equipment was moved from the Davenport Street location to the new location. A new spray booth was necessary to be built because the one in the previous location could not be moved. New electric wiring was necessary

for the plaintiff's use in the new plant. Upon moving it was discovered that an old creekbed ran through the Jackson Street property, which made it necessary, in order to provide a solid foundation for the heavy machinery, to dig holes and fill them with concrete because for the manufacture of stereophonic equipment the machinery had to be stabilized.

On July 27, 1960, Selby, chairman of the board of appraisers which awarded no damages to the tenant plaintiff, wrote to the officials of the city that in a hearing before that board Hoff claimed damages in behalf of the plaintiff which were estimated at $32,300. These items of damage claimed by the plaintiff consisted of the following: Cost of moving $21,070; electric sign $390; and test panel $10,840, a total of $32,300.

At the time of the appraisal, Robert S. Ballantyne owned 120 shares of stock in the company, Ethel C. Ballantyne, his wife, owned 120 shares, Hoff owned 80 shares, and his wife owned 80 shares.

Joseph Barker, Jr., testified in behalf of the defendant, that he had been appointed to the Auditorium Commission of the City of Omaha in January 1947, and was a member of the commission during its entire existence. He was secretary of the commission for the first 6 years and chairman for the last 4 years of its operation. He further testified that at the time the Auditorium Commission was formed in 1947, it had approximately $3,-300,000 to expend; that the Auditorium Commission selected a site for the auditorium and made its recommendation to the city council in 1947; that during the time of the pendency of the Ballantyne mandamus action the Auditorium Commission could not go forward with the acquisition of the site; and that in the fall of 1950, an additional bond issue was placed on the ballot for auditorium purposes.

The bond issue to appropriate money for the city auditorium purposes was placed on the ballot on November 7, 1950. The amount to be raised was $2,794,000 in addi-

tion to $3,540,000 which had been authorized for the purpose of building a new city auditorium.

The trial court's judgment consisted of 12 separate items, each of which was based upon an exhibit. We will take up the principal amount of each item in continuity and the exhibit relating thereto.

Item No. 1 was for $5,631.81. This was an invoice from B. Grundwald, Inc., for plumbing, relating to facilities such as air conditioning and hooking up to spray booths in the paint room. This expense was on the plaintiff's new location on Jackson Street.

Item No. 2 was for $941.27. This was an invoice from B. Grundwald, Inc., for work done to improve the heating system in the Jackson Street location.

Item No. 3 was for $3,348.41. This was an invoice from H. W. Stitt Construction Company covering items of work done in the new location such as general remodeling as a result of the removal, ventilating shafts, roofing, and shelving.

Item No. 4 was for $44.68. This was an invoice from the Henry W. Miller Electric Company covering wiring for a thermostat in the heating system in the plaintiff's new location.

Item No. 5 was for $7,806.16. This was an invoice from the H. W. Stitt Construction Company for work relating to the reconditioning of the premises at the plaintiff's new location, which included the cost of placing an incinerator on the inside of the newly acquired building, also work in placing a chimney on the building in connection with the incinerator, and painting or decorating the new building acquired by the plaintiff.

Item No. 6 was for $221.91. This was an invoice of the Henry W. Miller Electric Company covering wiring of machine tools in the plaintiff's new location.

Item No. 7 was for $2,887.59. This was an invoice from the H. W. Stitt Construction Company covering work done on the balcony and the closing of a rear door to the dock and stairway.

Item No. 8 was for $310.30. This was an invoice from the Henry W. Miller Electric Company for installation of light fixtures in the stock room in the plaintiff's new location.

Item No. 9 was for $874.72. This was an invoice from the Henry W. Miller Electric Company for work done in 1954, and portions of the statement relate to work done at another address, 4402 North Twenty-second Street, Omaha, and also for work done at the new location. This related to wiring and rewiring of two machines.

Item No. 10 was for $7,108.20. This was an account by the plaintiff of its employees identified by a series of timecards. From the timecards there appears an analysis of the payroll expense which was a compilation of salaries paid from June 27 through August 22, 1952, to certain employees of the plaintiff who handled the moving from the Davenport Street location to the Jackson Street location.

Item No. 11 was for $1,564.90. This consisted of checks payable to J. I. Kelly who was hired to supervise the moving operation from the Davenport Street location to the new location of the plaintiff on Jackson Street. The first check to Kelly was dated March 21, 1952. Kelly had been put to work to sort projector parts for eventual moving of the plaintiff to its new location.

Item No. 12 was for $548.99. This was a check issued to Union Freightways for moving of materials for the plaintiff to the new location on Jackson Street.

The above items of $5,631.81, $941.27, $3,348.41, $44.68, $7,806.16, $2,887.59, $310.30, and part of item $874.72, are items relating to charges for making the new premises fit for the use of the plaintiff. Items of $7,108.20, $1,564.90, and $548.99 are with reference to dismantling, removing, and reassembling expenses incurred by the plaintiff. The item of $221.91 and a part of item $874.72 relate to the wiring of machines reassembled. This item is not broken down as to allocation of machine wiring.

The plaintiff contends that in determining the fair and reasonable market value of a leasehold taken in condemnation, consisting of an operating plant, it is proper to consider the fair and reasonable cost of removing the machinery and equipment of the lessee from the leased premises, the fair and reasonable cost of transportation for a reasonable distance to another location, and the fair and reasonable cost of installing the same in the new location. The plaintiff cites several cases that apparently support its contention which we will not discuss in this opinion but which have been examined.

It is true that the decisions in the various states are not harmonious on this issue. However, in the absence of a statute, a lessee who, because of condemnation proceedings, is compelled to move from the condemned premises is not entitled to be compensated for moving expenses, as will be shown by the following cases which support the majority rule in this country.

The only case in this state on this subject is Mohler v. Board of Regents of the University of Nebraska, 102 Neb. 12, 165 N. W. 954, wherein this court held: "The provisions of sections 7118, 7120, Rev. St. 1913, relating to condemnation proceedings for the purpose of extending the campus of the state university construed, and held that the provisions thereof are declaratory and the measure of damages heretofore applied in this state prevails and that loss of time and the cost of removal are not elements of damage." The plaintiff insisted that under the statute he was entitled to prove that he lost time from his employment as a railroad engineer, and that he had been compelled to procure another house and move his household goods, all to his damage in the amount of $250. This court said: "The measure of recovery where property has been taken for a railroad right of way is the value of the land taken, and damages to the remainder of the tract not actually appropriated. This rule must have been in the mind of the legislature

when this statute was enacted. It is merely declaratory of the former law. There is nothing in the text to indicate that it was the intention of the legislature to introduce a new element of damage."

In the case of Williams v. State Highway Commission, 252 N. C. 141, 113 S. E. 2d 263, the court quite thoroughly discussed the issue that is before this court. In that case the State Highway Commission, in condemnation proceedings, took the entire leasehold, as in the instant case. The question was, should removal expenses and damages to the petitioner's stock of merchandise caused by such removal be included in the measure of just compensation and awarded to him? The court said: "The Fifth Amendment to the United States Constitution, which is a limitation upon the federal government, and not upon the states, * * * provides that private property shall not be taken for public use without just compensation. Art. I, Section 17, of the North Carolina Constitution uses language of similar import. * * * Under the settled rule against allowance for consequential losses in federal condemnation proceedings, expenses of removal or of relocation of personal property are not to be included in valuing property taken, where there is an entire taking of a condemnee's property, whether that property represents the interest in a leasehold or a fee. U. S. v. General Motors Corp., 323 U. S. 373, 89 L. Ed. 311; U. S. v. Petty Motor Co., 327 U. S. 372, 90 L. Ed. 729; U. S. v. Westinghouse E. & Mfg. Co., 339 U. S. 261, 94 L. Ed. 816."

It is apparent from the federal cases cited that if the government takes merely temporary occupancy of premises under lease, the cost of removal may be considered in determination of just compensation.

The court went on to say in the case of Williams v. State Highway Commission, *supra*: "A majority of the State Courts hold that, in the absence of a statute or agreement to the contrary, the removal costs of a stock of merchandise, or other personal property, and

the breakages or other injury to such property caused by such removal, from a leasehold or fee in land, where there is an entire taking of the whole of the condemnee's estate under the sovereign power of eminent domain, cannot be considered as an element of damage, since such loss is not a taking of property." See, Housing Authority v. Kosydor, 17 Ill. 2d 602, 162 N. E. 2d 357; Edgcomb Steel of New England v. State, 100 N. H. 480, 131 A. 2d 70; Emery v. Boston Terminal Co., 178 Mass. 172, 59 N. E. 763, 86 Am. S. R. 473; 4 Nichols on Eminent Domain (3 ed.), §§ 14.2471(2), 14.2471(3), pp. 401-414.

In the case of Housing Authority v. Kosydor, *supra,* the court said: "For the reasons stated we cannot agree with the suggestion that a denial of damages for defendants' moving expenses amounts to a confiscation of their stock in trade. Conceivably an expected return on their investment has been frustrated by the exercise of the power of eminent domain by an agency of the State. Similar frustrations have been involved in the denial of other incidental losses, due to continuing payrolls during the time spent in moving, * * *. At times they may be substantial for the individual. * * * But in the absence of legislation, * * * they have been regarded as a part of the burdens of common citizenship." A great number of cases are cited to sustain that court's view of the issue relating to moving expenses.

In Williams v. State Highway Commission, *supra,* the court went on to say: "The rationale of the decisions for not allowing the damages are: one, the tenant eventually would have to move anyhow, and this is one of the circumstances attached to placing property on leased premises; second, it is not a taking of property within the language of the constitution, in that the expense of moving and injury to the property in moving is neither a taking or damaging of the property; three, a verdict would be based on conjecture; four, such expenses constitute no gain to the taker; and five, a taking of real estate or a leasehold does not affect the owner-

ship of personal property kept on the premises taken, but not permanently affixed thereto, and the owner is entitled to remove such property." Several other cases are cited in the Williams case. See, United States v. Meyers, 190 F. 688; Metropolitan West Side El. R. R. Co. v. Siegel, 161 Ill. 638, 44 N. E. 276; Mayor & City Council of Baltimore v. Gamse, 132 Md. 290, 104 A. 429; Fiorini v. City of Kenosha, 208 Wis. 496, 243 N. W. 761; Korengold v. City of Minneapolis, 254 Minn. 358, 95 N. W. 2d 112; 18 Am. Jur., Eminent Domain, § 255, p. 894; Annotations, 34 A. L. R. 1523, 156 A. L. R. 397, 3 A. L. R. 2d 312; 29 C. J. S., Eminent Domain, § 175, p. 1048; 4 Nichols on Eminent Domain (3d ed.), § 14.247 (1), p. 400. All of these cases support the defendant's contention in the instant case. We deem further citation of authority relating to this issue unnecessary, but the above authorities fully declare the majority rule as heretofore stated.

There is some contention made by the plaintiff that the constitutional provisions in some of the cited cases made by the defendant relating to the above issue are different than the Constitution of this state which provides in Article I, section 21: "The property of no person shall be taken or damaged for public use without just compensation therefor."

As to the case of Korengold v. City of Minneapolis, *supra,* Article I, section 13, of the Minnesota Constitution, provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

As to the cases of Housing Authority v. Kosydor, *supra,* and Metropolitan West Side El. R. R. Co. v. Siegel, *supra,* cited with approval in Williams v. State Highway Commission, *supra,* the Illinois Constitution, Article II, section 13, provides in part: "Private property shall not be taken or damaged for public use without just compensation."

The words "or damaged" do not change the rule of

law stated in Platte Valley Public Power & Irr. Dist. v. Armstrong, 159 Neb. 609, 68 N. W. 2d 200, where the court held that the measure of damages in the taking or injury of a leasehold is the difference between the rental value of the remainder of the term and the rent reserved in the lease. This case cites State v. Platte Valley Public Power & Irr. Dist., 147 Neb. 289, 23 N. W. 2d 300, 166 A. L. R. 1196, as follows: "If a leasehold interest is taken, or injured, the lessee is entitled to a sum which will restore the money loss consequent to the taking or injury. This consists generally of the fair market value of the leasehold or unexpired term of the lease, and is said to be the difference between the rental value of the remainder of the term and the rent reserved in the lease. * * * Where the rent reserved equals or exceeds the rental value, the lessee has suffered no loss and cannot recover."

This brings us to the consideration of the leasehold here involved.

The plaintiff contends that with knowledge of the fact that a public improvement is proposed and preliminary steps have been taken to acquire property in condemnation, but a delay of nearly 2½ years ensues without further action by the condemner, one may acquire a leasehold interest in such property 2 years after the last step was taken, which leasehold will be the subject of damages.

The plaintiff cites many cases on this issue, such as Maher v. Commonwealth, 291 Mass. 343, 197 N. E. 78, wherein the court said: "Until divested of their title, either by a taking by the commission under eminent domain, or by delivery by them of a deed to the Commonwealth and taking the other steps above described, the landowners possessed all the attributes of ownership in fee of their land. In making changes and improvements on their land, they were simply exercising their rights as proprietors." Other cases, while not using the same type of language, sustain the rule as

announced in the above-cited case. See, Briggs v. Commissioners of Labette County, 39 Kan. 90, 17 P. 331; State v. Stabb, 226 Ind. 319, 79 N. E. 2d 392; Herron v. Pittsburgh, 281 Pa. St. 401, 127 A. 64; State Highway Commission v. Holden, 217 Ark. 466, 231 S. W. 2d 113; 18 Am. Jur., Eminent Domain, § 256, p. 896; 4 Nichols on Eminent Domain (3d ed.), § 12.1 (4), p. 22.

The plaintiff asserts that the report of the appraisers was not approved by the city council until July 10, 1951, therefore, under the authorities cited, the plaintiff could lease the property without regard to the city, and is entitled to be compensated under this state's Constitution.

The leases here involved are described as follows.

It appears that the buildings on the Davenport Street location were completed at three different times. There were three leases made at three different times which covered the subject property. These leases were made by Robert S. Ballantyne to the plaintiff. The first lease was dated June 1, 1949, for a term of 3 years, with the expiration date May 31, 1952. The rental was $750 a month, plus taxes to be paid by the lessee. This lease covered Lot 2, Block 78, original city of Omaha.

The second lease was dated July 12, 1949. The term covered was from date of completion to May 31, 1952. The rental was $210 a month, with taxes paid by lessor. The property covered was the north 69 feet of the east 22 feet of Lot 3, Block 78, original city of Omaha.

The third lease was dated July 12, 1950, the term from date of completion to May 31, 1952. The rental was $625 a month, with taxes paid by the lessor. This lease covered Lot 3, except the north 69 feet of the east 22 feet thereof, and the north 55 feet of the south 60 feet of Lot 4, Block 78, original city of Omaha.

The fourth lease, starting at the expiration of the above three leases, was dated July 12, 1950, for a term of 10 years from June 1, 1952, to May 31, 1962. The rental was $1,750 a month, with lessee paying all regu-

lar taxes. This lease was dated after 2 years delay in going forward with the condemnation.

. Hoff testified that the difference between the value of the leasehold and the rent reserved was between $65,000 and $70,000. An offer of proof was not objected to that Robert S. Ballantyne would testify that such value was between $55,000 and $60,000. Hoff further testified that, as to the fourth lease, the plaintiff was not paying too much rental.

Selby made an appraisal of the leasehold, and in his opinion it had no value as of the date of taking. According to this appraisal, the economic rental of the premises was $18,473.88. The contract rental was $19,843.81 per year. The contract rental exceeded the economic rental in the amount of $1,369.93 per year. Relating to the Kennedy and Undeland appraisal made for the plaintiff as a face valuation to determine the value of the leases, this witness determined that the economic rental should have been $19,040.03, or that the economic rent was exceeded by the contract rental in the amount of $803.78.

This witness also made an appraisal of the leasehold by using the capitalization approach. By using this approach he found that the contract rent was excessive.

The plaintiff asserts that its business is highly specialized and doing a volume in excess of one million dollars a year; and that in appraising the value of the leasehold the volume of the business was not taken into account by the defendant's appraiser. The plaintiff cites Phillips Petroleum Co. v. City of Omaha, 171 Neb. 457, 106 N. W. 2d 727, wherein this court, quoting from James Poultry Co. v. City of Nebraska City, 135 Neb. 787, 284 N. W. 273, said: " 'The volume of business done on any given leasehold has a direct relation to the value of the leasehold, as volume is directly connected with the success of the business, and diminution of business means decrease in volume.' " The plaintiff asserts that without consideration of the scope, extent, volume, and profitable

results of the plaintiff's business as the basic factor, a proper appraisal of the leasehold could not be made.

In James Poultry Co. v. City of Nebraska City, *supra,* this court said: "Evidence of the volume of business transacted on a leasehold may be shown, not as an independent item of damage, but as it affects the market value of the leasehold before and after the construction of the improvement."

There is no competent evidence in the record to show that the plaintiff's volume of business had diminished or that it has been lessened in any degree because it was forced to move from the old location to the new. In the absence of such proof, there is no merit to the plaintiff's contention insofar as it relates to the volume of business.

The evidence adduced by the plaintiff relating to the value of the leasehold shows the rent reserved equals or exceeds the rental value of the leasehold, consequently the lessee has suffered no loss and cannot recover. See Platte Valley Public Power & Irr. Dist. v. Armstrong, *supra.*

It appears from the judgment of the trial court that it made no specific finding with reference to the value of the leasehold but did, as shown by the 12 items above, allow damages for the amounts shown therein, with interest.

In the light of the record and the authorities heretofore referred to, we conclude that the judgment of the trial court, which has the effect of a jury verdict, was clearly wrong, and that such judgment should be reversed and the cause remanded with directions to dismiss the plaintiff's action.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., participating on briefs.