REQUESTED BY: John A. Hilgert, Nebraska State Senator
We have received your request for an opinion on several questions. Your questions center on the constitutionality of LB 1432, termed the "Agricultural Suppliers Lease Protection Act" (hereinafter "the Act"). As of April 11, 2000, an interim study of LB 1432's impact is being conducted, pursuant to LR 498. Your six questions focus on whether LB 1432's requirements upon the parties holding railroad lands are constitutional. You ask whether the requirements of the Act constitute a taking of private property, impair the obligation of contracts, or are inconsistent with Nebraska's constitutional equal protection requirements and special legislation requirements. Lastly, you inquire whether LB 1432 imposes burdens upon interstate commerce or otherwise conflicts with the Constitution of the State of Nebraska. We will examine each of these contentions in order.
As background, LB 1432 intends to maintain reasonable access to rail service for continued agricultural prosperity, hence it protects agribusiness leaseholders' investments in improvements adjacent to railroad tracks by requiring a lease dispute resolution system. LB 1432 § 2. An "agricultural tenant" is any grain warehouse, chemical distributor, or other agricultural input provider with improvements on railroad land. LB 1432 § 3. Railroad land means land owned by a railroad upon which a leasing tenant occupies improvements. LB 1432 § 3(4). The Act requires the parties with interests in railroad land to negotiate controversies on lease terms, to provide notice of lease changes, to submit to the Department of Agriculture's administrative review any unresolved controversy, and to split the costs of such administrative resolution. LB 1432 § 4. Additionally, railroad land holders must give the agricultural tenant a right of first refusal upon a new lease, and the holder must negotiate with the tenant whether compensation is required for fixtures left there. The parties' inability to agree upon a value results in the value being determined by the Department of Agriculture (hereinafter "the Department"). LB 1432 § 5. A former tenant must be reimbursed for the fair market value (hereinafter "FMV") of any improvements left upon railroad land, after the landlord terminates the lease without cause to terminate. LB 1432 § 5(1). Leases already entered into are not effected by this Act, unless they are materially modified after enactment of LB 1432. LB 1432 § 6.
 I. TAKING OF PRIVATE PROPERTY
Your first question asks whether LB 1432 constitutes a taking of private property. Government actions may not take property without due process of law under U.S. Const. Amends. 5 14, nor without compensating the former owners for the taking and damages therefrom under Neb. Const. art. 1, § 21. Nebraska Public ServiceCom'n v. Nebraska Public Power Dist., 590 N.W.2d 840, 848,256 Neb. 479, 489 (1999); Whitehead Oil Co. v. City of Lincoln,515 N.W.2d 401, 408, 245 Neb. 680, 689, 690 (1994). These requirements apply when the government improperly exercises its police power through land-use regulations or zoning. Id.
Additionally, a taking can result from a regulatory scheme or a permanent physical occupation of property. Bargmann v. State,Dept. of Roads, 600 N.W.2d 797, 804-805, 257 Neb. 766, 774-775
(1999).
Do the requirements upon tenants and holders of railroad land under LB 1432 effect a taking? LB 1432's effects upon "agricultural tenants", as defined in LB 1432 § 3(1), are not likely to be challenged by tenants as a land-use regulation or other form of taking, since LB 1432 would work to reduce any losses the tenant might be susceptible to in transactions with a holder of railroad land. Any challenge of LB 1432 as taking property rights would likely be from a holder of railroad land. The State is not engaging in eminent domain under LB 1432. The possibility of a physical occupation by the State is eliminated, so only a regulatory taking is possible under LB 1432.
Does LB 1432, by regulating the contractual relationship between the tenant and holder of railroad land, take or otherwise damage property rights of the holder of railroad land? Under LB 1432 § 4, the parties may voluntarily resolve lease controversies, and if unable to resolve their differences, the parties will have the Department resolve them administratively. This includes determining the FMV of the parties' property. Further, LB 1432 § 5 requires compensation to a tenant from a holder for any property value of improvements lost by the tenant, if the lease was terminated without cause by the holder. The FMV is again determined by the Department. These Department resolutions have the procedural safeguards of the Administrative Procedures Act built in, with the right to judicial review. LB 1432 § 4(3). These requirements upon holders of railroad land are the sections most likely to be challenged as a taking.
Since a holder of railroad land is most likely to challenge LB 1432, then the holder must show that the effect of LB 1432 upon the values of property located on railroad land rises to a taking under the U.S. Constitution, or damages the holder of the land under the Nebraska Constitution. Inverse condemnation by the State is what the holder must show. "Inverse condemnation is a shorthand description for a landowner suit to recover just compensation for a governmental taking of the landowner's property without the benefit of condemnation proceedings." Strom v. Cityof Oakland, 538 N.W.2d 311, 316 255 Neb. 210, 217 (1998) (citations omitted). But prior to determining if the Act's requirements cause a taking, the court must determine if the holder has any property right that can be taken. A determination of the holder's personal or real property rights is precedent to reach the takings question.
Estates in land are real property which may be subject to a government taking, while personal property is not subject to a taking. Therefore, the question becomes, is the lease contract between a holder and lessee an estate in land which is real property, or a contract, which is personal property? Personal property is defined as "any movable or intangible thing that is subject to ownership and not classified as real estate." Black'sLaw Dictionary 1233 (7th ed. 1999). Real estate is defined to include all lands, tenements, hereditaments and chattels real for conveyancing purposes. Neb. Rev. Stat. § 76-201. In that context, the Nebraska Supreme Court has provided guidance in determining whether a lease is an estate in land, subject to a taking, or a contract, which is not subject to a taking:
 The question as to whether or not a leasehold for a term of ninety-nine years is real estate is discussed at length . . . and while it is true that for purposes of conveyancing a lease of more than one year is termed real estate and may be referred to as real estate in a highly technical sense, still it cannot be said that a lease for more than one year is real estate in the common acceptation of the term . . . . Therefore, the 99-year leasehold is not real estate, but personal property under Nebraska law . . . .
In re Estate of Smatlan, 501, N.W.2d 718, 721, 722,1 Neb. App. 295, 300 (1992) (citations omitted). See also, BallantyneCo. v. City of Omaha, 113 N.W.2d 486, 494, 173 Neb. 229,242 (1962) (Stating removal and relocation expenses are not included in condemnation awards for a leasehold); Phillips Petroleum Co. v.City of Omaha, 106 N.W.2d 727, 171 Neb. 457 (1960) (Ruling contract rights in an unexercised option to purchase real estate are not compensable in a condemnation action, since a contract is not an estate in land). Since LB 1432 focuses upon contractual equities, and not on real estate conveyancing requirements, it is unlikely the lease requirements of LB 1432 would effect an estate in land. A court would likely find leases under LB 1432 are personal property, and not subject to a takings claim. It should be noted, LB 1432 § 4(1) refers to lessees, licensees, and owners in the same context. We believe that the court would treat lessees, licensees and owners similarly. A holder could not claim a taking with any of these contracts.
Even if a holder were able to convince a court that leases are an estate in land, and subject to a takings challenge, then the holder must prove the Act's requirements upon the real property rise to a taking. LB 1432 § 5(1) requires that a former agricultural tenant be reimbursed for the FMV of any improvements left upon railroad land, after the holder terminated the lease without cause to terminate. A holder could claim that this section of the Act is an inverse condemnation of railroad land, and that the holder of such land be paid for a denial of its use of its land and for damages to its property. Whitehead Oil Co.,515 N.W.2d at 408, 245 Neb. at 689, 690. The litigating holder of railroad land must show that the Act's reimbursement requirement to former tenants is a taking. Specifically, the holder must prove the Act's "land-use regulation" in § 5(1) denies the holder economically viable use of its land, and the Act fails to substantially advance any legitimate state interest. "Land-use regulation does not effect a taking if it `substantially advances legitimate state interests and does not deny an owner economically viable use of his land.'" Whitehead Oil Co., 515 N.W.2d at 408,245 Neb. at 689, quoting Nollan v. California Coastal Comm'n,483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 65 L. Ed. 2d 106 (1980). "[L]and-use regulations which substantially advance legitimate state interests do not effect a taking merely because the regulation caused a diminution in property value alone." Strom v.City of Oakland, 538 N.W.2d at 318, 255 Neb. at 220. The court has described some of the factors used to determine if a regulation rises to a taking, such as the extent to which the regulation has interfered with distinctive investment-backed expectations. Whitehead Oil Co.,515 N.W.2d at 408, 245 Neb. at 689, 690. The court further states:
 A taking may more readily be found when the interference can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
Whitehead Oil, 515 N.W.2d at 408, 245 Neb. at 689, quoting PennCentral Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646,57 L. Ed. 2d 631 (1978) (citations omitted).
The state's interest in promoting investment by agricultural tenants and maintaining access to rail service by reimbursing agricultural tenants for their lost investment in fixtures left on railroad land are legitimate state interests, which help override any takings claim the holder might make. LB 1432 § 2. Such a result would be consistent with the equitable principle that a landlord should not be enriched by property the tenant cannot practicably remove from the land upon lease termination. It's unlikely the holder could prove LB 1432's requirements rise to a taking under the U.S. Constitution.
The holder may still attempt to claim damages from the "land-use regulation" of LB 1432 under Neb. Const. art. 1, § 21. While actual damages have been granted under the Nebraska Constitution when eminent domain diminishes the value of private property, the Nebraska Supreme Court refuses to give damages to parties who cannot prove a regulatory taking under the U.S. or Nebraska Constitutions. As the Court notes:
 Notwithstanding the difference between the federal and state constitutions, this court has analyzed the state constitutional issue of whether there has been a regulatory taking or damage for a public use by treating federal constitutional case law and our state constitutional case law as coterminous.
Strom, 538 N.W.2d at 316, 255 Neb. at 216. Since this is a regulatory takings claim, and not a claim of physical invasion of property, the holder of railroad land probably couldn't collect damages under the Nebraska Constitution without showing a taking under the U.S. Constitution.
In sum, the parties most likely to challenge the Act as a taking are holders of railroad land. Since the Act generally applies to contractual rights between holders of railroad land and licensees, owners and lease tenants, it effects only personal property, and would be exempt from a takings challenge. If the Act's effect upon leases were construed to be an estate in land, it is still likely the Act would withstand a Constitutional challenge claiming taking of property by government regulation. The Act's legitimate state interests would likely outweigh any harms to property values, plus the Act does not deprive the holder of economically viable use of the holder's land.
 II. IMPAIRMENT OF THE RIGHT OF CONTRACT
Your second question focuses upon the impairment of the parties' contract by the requirements of LB 1432. There are two avenues of challenging the validity of a statute as impairing the right to contract. "Article I, § 10 of the [U.S.] Constitution provides: `No State shall . . . pass any . . . Law impairing the Obligation of Contracts." General Motors Corp. v. Romein,112 S. Ct. 1105, 1109, 503 U.S. 181, ___ L. Ed. 2 ___ (1999) (citations omitted). The Nebraska Supreme Court has stated ". . . ArticleI, § 16, Constitution of Nebraska forbids and makes ineffective any `law impairing the obligation of contract'". State Bd. ofEducational Lands and Funds v. Haberman, 214 N.W.2d 266, 268,191 Neb. 127, 129 (1974). In both cases the effect is that the "legislature is powerless to pass law impairing the obligation of contracts". State ex rel. City Water Co. v. City of Kearney, 68 N.W. 533, 49 Neb. 325 (1896).
LB 1432, as stated, places requirements upon the agricultural tenant and holder of railroad land. LB 1432 §§ 4 5. These requirements include the possible resolution of controversies between the parties by the Department, the reimbursement of expenses to the Department for its costs in forming a resolution, the right of first refusal by the current tenant upon lease expiration, and the compensation of former agricultural tenants for the fair market value of abandoned fixtures upon railroad land. LB 1432 §§ 4(3), 4(4) 5(1). These requirements would affect every new contract entered into by agricultural tenants and holders of railroad land. LB 1432 § 6. LB 1432 would not effect contracts which were being executed at the bill's enactment, except as described below. This avoids most potential impairment problems, as ". . . [a] statute may not operate retroactively where it would impair the obligation of a contract or interfere with a vested right." State Bd. of Educational Lands and Funds v.Haberman, 214 N.W.2d 266, 268, 191 Neb. 127, 139 (1974).
The only potential problem that may arise would be with the application of LB 1432 § 6 to existing contracts which are being modified. In particular, the act states it applies to ". . . any renewal or extension of such lease on any different terms or conditions or any material modifications of any such lease effected on or after the effective date of this act." LB 1432 § 6. This requirement applies to executory leases, and might be challenged by holders of railroad land as retroactive application of the Act. A modified lease would have different terms and conditions from the original, as would a renewed lease. Both require the parties mutual assent to be executed. "Mutual assent by the parties is required to modify a contract that substantially changes the liabilities of the parties." Solar Motors, Inc. v.First Nat. Bank of Chadron, 545 N.W.2d 714, 721, 149 Neb. 758, 768
(1996). However, this would not be a "new" lease contract under the Act, since no new consideration is necessary. "[A] written executory contract may be modified by the parties thereto at any time after its execution and before a breach has occurred, without any new consideration . . ." Rees v. Huffman, 384 N.W.2d 631,635, 222 Neb. 493, 498 (1986). A modified lease must be sufficiently different from the original lease to show the Act is not being applied to it retroactively.
In a modified lease, the parties would be presumed to know the law when bargaining for modification, including the requirements of LB 1432. However, a party could still challenge LB 1432 for impairing the modified contract. A litigant would have the burden of showing the statute impairs the modified lease. In contract impairment analysis "[g]enerally, we first ask whether the change in state law has `operated as a substantial impairment of a contractual relationship.'" General Motors Corp. v. Romein,112 S. Ct. at 1109, 503 U.S. at 186. In particular, the plaintiff must satisfy three elements, that ". . . there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Id. It would be difficult for a litigant to show all three components. For instance, it is not clear how either party would be harmed by having disputes settled by the Department, after the parties themselves had an opportunity to negotiate a resolution. Nor would it appear harmful to require any potential tenant to pay fair market value for a railroad land lease. A court would base its impairment analysis upon relevant factors, including ". . . whether the impairment disrupts the parties' settled expectations, and whether the parties reasonably relied on the impaired right . . ." Koster v. City of Davenport, Iowa, 183 F.3d 762, 767 (8th Cir. 1999) (citations omitted). LB 1432 § 5(1) requires that any agricultural tenant which has its lease terminated without cause be reimbursed by the holder of railroad land for the FMV of fixtures on the land. This section is most susceptible to an impairment challenge. But the litigant must convince a court the holder of railroad land based his contract upon an expectation that the holder would retain valuable fixtures, if the tenant's lease was terminated early, for reasons other than contractual breach, and the tenant would not be compensated for the value of these fixtures. Such a result would be inequitable. Courts have stated ". . . [P]rivate contract rights must yield to the public welfare, where the latter is appropriately declared and defined, and the two conflict, has been often decided by this court."Placek v. Edstrom, 37 N.W.2d 203, 208, 151 Neb. 225, 233 (1949), quoting Union Dry Goods Co. v. Georgia Public Service Corp.,248 U.S. 372, 39 S.Ct. 117, 118, 63 L. Ed. 309. The stated interest of protecting an agricultural tenant's investments on railroad land would further the goals of promoting investment and prosperity in agriculture. LB 1432 § 2. The Act's provisions don't clearly cause an impairment of contracts, and would likely survive such a challenge.
 III. EQUAL PROTECTION
Your third question is whether LB 1432 is inconsistent with Nebraska's Constitutional Equal Protection Requirements. Until recently, Nebraska has not had the same language in it's Constitution as is contained in the United States Constitution Article 14. Neb. Const. art. I, § 3 contains the requirement that: "No person shall be deprived of life, liberty or property, without due process of law, nor be denied equal protection of the laws." This change came from Amendment One being approved by voters in 1998. See Amendment One: The Nebraska Equal ProtectionClause, 32 Creighton Law Review 611, 612 (1998). Prior to the passage of the amendment to the Nebraska Constitution, other sections acted to provide equal protection rights. Kuchar v.Krings, 540 N.W.2d 582, 586, 248 Neb. 995, 1000 (1995) (using the federal Equal Protection Clause and Neb. Const. art. III, § 18 in the same equal protection analysis.) Prior to the amendments passage, the court has stated "The Nebraska Constitution and U.S. Constitution have identical requirements for equal protection challenges." DeCoste v. City of Wahoo, 583 N.W.2d 595, 601,255 Neb. 266, 274 (1998). Since the amendments passage, the court has not taken an opportunity to determine if the test has changed for equal protection under the Nebraska Constitution. See State v.Reeves, 258 Neb. 511, 520, 604 N.W.2d 151, 156 (2000). Hence, the analysis here is the same for both the U.S. and State Constitutions.
Does LB 1432, by requiring holders of railroad land to submit to lease reviews, and provide payment to tenants in certain early lease terminations, violate these holder's rights to equal protection of the law? A litigating holder of railroad land has the burden of showing the unconstitutionality of LB 1432. Pick v.Nelson, 528 N.W.2d 309, 318, 247 Neb. 487, 498 (1995). To show a violation of equal protection, holders of railroad land must be treated differently from similarly situated persons. DeCoste,583 N.W.2d at 601, 255 Neb. at 274. LB 1432 applies its requirements to holders of railroad land with agricultural tenants upon the land. LB 1432 §§ 3, 4 5. It does not apply to tenants who are not "agricultural tenants". LB 1432 § 3(1). Holders of railroad land with agricultural tenants are treated differently than their counterparts without agricultural tenants, causing a classification to occur. Once dissimilar treatment has occurred, the inquiry shifts to consider whether the ordinance at issue can survive judicial scrutiny. DeCoste, 583 N.W.2d at 601,255 Neb. at 275. Holders of railroad land with agricultural tenants are not members of a suspect class, nor is there a fundamental right implicated herein. Since this Act implicates only economic factors, and not a suspect class nor fundamental right, then the court will ask only "whether a rational relationship exists between a legitimate interest and the means selected . . . to accomplish that end." Id.
LB 1432 must have a rational relationship to some legitimate interest for it to avoid violating the equal protection clause. This act creates a dissimilarity between holders of railroad land contracts with agricultural tenants and non-agricultural tenants. The act's objective in imposing additional requirements upon contracts with agricultural tenants is to further prosperity of agriculture in Nebraska and to maintain its access to rail service. LB 1432 § 2. Further, the Act finds agribusiness leaseholders at a disadvantage in lease negotiations because of their dependency upon rail access next to their businesses structures and improvements. Id. The Act's stated purpose is to establish a system for fair resolution of lease disputes between parties, and to guard against unreasonable lease renewal terms and unjust lease terminations. The Act's effect would require negotiation in lease terms between holders of railroad land and their agricultural tenants, followed by an administrative resolution upon written notice, if negotiations fail. LB 1432 § 4. The holders would have to offer a right of first refusal upon any lease to the former agricultural tenant, and reimburse the former agricultural tenant if a lease is terminated early without cause. LB 1432 § 5. These actions would appear to fulfill the stated purposes of the Act. Further, the Legislature could rationally determine Nebraska's dependence upon agriculture, and the need for agricultural tenants, justifies requirements that protect the tenants' investments in fixtures upon railroad land. "The Equal Protection Clause does not require the Legislature to eliminate all evils in order to legislate against some." Schindlerv. Department of Motor Vehicles, 593 N.W.2d 295, 298,256 Neb. 782, 786 (1999). The rational relationship between the objectives of the Act and its methods means the Act would likely survive a challenge of it's constitutionality on equal protection grounds.
 IV. SPECIAL LEGISLATION
Your fourth question in your request is whether LB 1432 is inconsistent with Nebraska's Special Legislation Requirements. Our State Constitution has limitations upon special legislation in Neb. Const. art. III, § 18, which include a prohibition on local or special laws which ". . . grant to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever." This section was interpreted to include the same protections as the federal equal protection clause. U.S.C.A. Const. art. 14. "The Nebraska Constitution and the U.S. Constitution have identical requirements from equal protection challenges." Pick v. Nelson, 528 N.W.2d 309, 318,247 Neb. 487, 498 (1995) citing Robotham v. State, 488 N.W.2d 533,539, 241 Neb. 379, 385. Robotham described the test under Neb. Const. art. III, § 18: "In an equal protection challenge Neb. Const. art. III, § 18 `classifications that do not involve a suspect class or fundamental right are tested for rational basis'". Id. The recent enactment of the amended Neb. Const. art. I, § 3 now contains an explicit "equal protection clause" which mirrors the United States Constitution.
With the above in mind, the analysis of LB 1432's constitutionality under the Nebraska Constitution's Special Legislation clause would use the same tests as the above equal protection analysis. The state Supreme Court has reiterated this fact. In DeCoste v. City of Wahoo, the court again stated: "The Nebraska Constitution and the U.S. Constitution have identical requirements from equal protection challenges." DeCoste,583 N.W.2d at 601, 255 Neb. at 274. In August 1998, after the amendments to Neb. Const. art. I, § 3 had passed, DeCoste was decided. The same conclusion as was reached above must be reached here. LB 1432 would likely survive a constitutional challenge on special legislation grounds.
 V. INTERSTATE COMMERCE CLAUSE
Your fifth question asks whether LB 1432 would impose a burden upon interstate commerce. The dormant commerce clause is a portion of U.S. Const. art. I, § 8, cl. 3 which prevents state and local governments from impeding the free flow of goods from one state to another. Houlton Citizens' Coalition v. Town of Houlton,175 F.3d 178, 184 (1st Cir. 1999). "In evaluating whether a challenged state regulation impermissibly infringes upon interstate commerce, a court must first determine whether the regulation even affects interstate commerce." United WasteSystems of Iowa, Inc. v. Wilson, 189 F.3d 762, 765 (8th Cir. 1999). If LB 1432 discriminated upon interstate commerce directly, then it would be ". . . per se invalid, save in a narrow class of cases in which the state can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Id at 767. Since LB 1432 does not distinguish between Nebraska tenants or lessors and out-of-state tenants or lessors, it is not explicitly discriminatory. Its impact is likely incidental.
Next, it must be determined if LB 1432 has an indirect impact upon interstate commerce. The test that is used in this case states:
 "[W]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . ."
CenTra, Inc. v. Chandler Ins. Co., Ltd., 540 N.W.2d 318, 332,248 Neb. 844, 864 (1995), citing Pike v. Bruce Church, Inc.,397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L. Ed. 174 (1970).
LB 1432's objectives, stated above, indicate a desire to maintain agricultural access to rail service, by alleviating agricultural tenant's disadvantage in lease negotiations, which arises from their dependency upon rail access next to their businesses' structures and improvements. LB 1432 § 1. These benefits must outweigh the burden upon interstate commerce. LB 1432 affects entities which hold parcels of land in Nebraska. Its regulations effect the transactions between the landlord and tenant upon those parcels. The lease contracts and licenses upon that land, and the possible reimbursement of former tenants, are both requirements particular to Nebraska realty and improvements on that realty. The only effects upon out-of-state entities would be for contractual acts on their Nebraska real estate. By regulating acts tied directly to Nebraska realty, it is difficult to imagine a law with less impact upon interstate commerce which could effect the same objectives. Courts recognize the difficulty in creating a law that has no interstate impact. "Because even `local' activities displace the movement of goods, services, funds and people, almost every state and local law-indeed almost every private transaction-affects interstate commerce." National Paint Coatings v. City of Chicago, 45 F.2d 1124, 1131 (7th Cir. 1995). The slight burdens LB 1432 would have on out-of-state landlords and tenants must outweigh the benefits it provides to show a violation of the commerce clause.
LB 1432 does not effect items which might move out-of-state, such as vehicles or trains. The holders of railroad land will not have their tracks or trains regulated by this Act in any way. The tenants upon railroad land interest in fixtures, by its very nature, is exclusively local. It is possible the out-of-state holders of railroad land would argue that monetary costs in reimbursing former tenants causes them to raise costs of rent to future tenants, turning away some future out-of-state tenants, and limiting the holder's income. This contention has been rejected in several other cases, however. In United Waste Systems, the 8th Circuit court rejected arguments that a law could cause possible loss of future business, resulting in fewer purchases of interstate goods, and was an unreasonable burden upon interstate commerce. United Waste Systems of Iowa, Inc. at 766-767. InHoulton Citizens' Coalition, the 1st Circuit court found a city's ordinance which awarded an exclusive waste contract to any bidder not unduly burdensome upon interstate commerce, regardless of the contract going to an in-state or out-of-state party. The out-of-state party's claim of potentially lost business was rejected. Houlton Citizens' Coalition v. Town of Houlton,175 F.3d at 188-189. The U.S. Supreme Court found that Kansas regulations upon local producers of natural gas from a Kansas gas field, although connected to federally regulated interstate gas pipelines, were valid, being within Kansas' correlative rights to control producers of Kansas' natural gas. Northwest Pipeline v.Kansas Corp. Comm., 489 U.S. 493, 524, 109 S.Ct. 1262,103 L. Ed. 2d 509 (1989). The court's allowance of a local regulation on Kansas gas producers in an interstate system, as opposed to a prohibited regulation of interstate purchasers in the same gas system, is analogous to LB 1432's regulation upon owners and tenants of Nebraska railroad land, rather than regulation of transportation of products from these owners and tenants. Id. The putative benefits of maintaining access for agricultural goods by protecting the investments of agricultural tenants would outweigh the slight burdens upon out-of-state holders of railroad land in contract requirements. The Act should survive a commerce clause challenge.
 VI. OTHER CONSTITUTIONAL ISSUES
Your last question inquires into whether any other aspects of LB 1432 conflict with the Nebraska Constitution. There are two possible areas of concern that appear.
The first area of concern is whether LB 1432 is effected by federal preemption of laws effecting railroad transportation. State law is preempted if it conflicts with federal law, by virtue of the U.S. Constitution. U.S. Const. art. VI, cl. 2. From our review of the Surface Transportation Board's jurisdiction, which regulates railroad tracks, it appears that LB 1432 does not clearly effect the federal statutory scheme. 49 U.S.C.A. § 10501. LB 1432 is likely not preempted by federal law.
The second possible area of concern is the meaning of some terms in LB 1432. It could be argued that it is not apparent what the term "agricultural tenant" encompasses. LB 1432 § 3(1). The limitation in § 3 (1) upon "the sale or distribution of . . . other products used or useful in the production of agricultural crops and livestock . . ." is quite broad.
 When a legislative enactment is challenged on vagueness grounds, the issue is whether the two requirements of procedural due process are met: (1) adequate notice to citizens and (2) adequate standards to prevent arbitrary enforcement. In other words, due process requires that an enactment supply (1) a person of ordinary intelligence a reasonable opportunity to know what is prohibited and (2) explicit standards for those who apply it."
Ponderosa Ridge LLC v. Banner County, 554 N.W.2d 151, 159,250 Neb. 944, 955 (1996). It is possible that sales of products "used or useful" in agriculture could include oil, fuel, lumber, concrete, vehicles and numerous other items. LB 1432 § 3(1). Further legislative definition or administrative interpretation by the Department of Agriculture may be desirable.
 CONCLUSION
LB 1432 requires that holders of railroad land perform certain contractual duties with their licensees, fixture owners and tenants upon railroad land, if those parties fit the description of an "agricultural tenant". These duties include possible submittal of controversies upon leases between the holder of railroad land and the agricultural tenant to the Nebraska Department of Agriculture for resolution. Agricultural tenants are to have right of first refusal upon new leases, and holders of railroad land may have to reimburse prior tenants for the value of fixtures left upon railroad land after early termination of a lease, if terminated without cause by the land holder.
These restrictions are likely not a constitutional taking, since the requirements focus upon contract rights, not estates in land. Even if construed to effect estates in land, not just contract rights, the Act's land use regulation would still not rise to a taking. The adjustment of contractual rights between landlords and tenants by the Act does not amount to a physical invasion by the State, the latter being a taking. Second, LB 1432 would effect new transactions between railroad land holders and agricultural tenants, and not apply to former contracts, unless they are modified. If contracts are modified, a litigant alleging that the Act impairs the contract would have difficulty showing they were harmed by mandatory lease negotiations after their own voluntary negotiations failed. Further, it would be difficult to show harm when land holders were required to pay former tenants the FMV of fixtures retained. Third, the mentioned requirements upon holders of railroad land would be a dissimilar treatment from railroad land holders without agricultural tenants, requiring an equal protection analysis. However, it is very likely the legitimate objectives of LB 1432 bear a rational relationship to the requirements upon holders of railroad land. The same analysis applies both for equal protection and special legislation requirements. A violation of the interstate commerce clause requirements appears unlikely, since LB 1432's perceived benefits would likely outweigh any burden upon interstate commerce it might have. It's effect on interstate commerce is slight and negligible. Preemption of LB 1432 by federal statute is unlikely.
Sincerely,
 DON STENBERG Attorney General
 William R. Barger Assistant Attorney General
APPROVED BY:
______________________________DON STENBERG
Attorney General pc: Patrick J. O'Donnell Clerk of the Legislature